DAVIS, Judge.
 

 *100
 
 Silvestre Alvarado Chaves ("Defendant") appeals from his conviction for second-degree murder. On appeal, he contends that the trial court erred by declining to instruct the jury on voluntary manslaughter. After careful review, we conclude that Defendant received a fair trial free from error.
 

 Factual Background
 

 The State presented evidence at trial tending to establish the following facts: In December of 2009, Defendant began dating Crystal Gigliotti ("Crystal"), and they began living together in an apartment in Durham, North Carolina in May of 2010. Their relationship subsequently deteriorated, and they frequently argued. The majority of their arguments
 
 *101
 
 centered around Defendant's jealousy over Crystal's relationships with other men.
 

 As a result of these arguments, Defendant would periodically leave their apartment and stay with his brother. On several occasions, Defendant displayed his anger over Crystal's conduct by "cut[ting] the lines on the washing machine and dryer and haul[ing] them out of the house" and "taking her cellphone and house phone." On another occasion, upon returning to the apartment and finding Crystal with another man, Defendant attacked both of them.
 

 Around April or May of 2011, Crystal began seeing another man known only as "Marto."
 
 [1]
 
 On 3 May 2011, Crystal called and texted Defendant numerous times while he was at work. She asked him to come to the apartment that evening to pick up some of his belongings. She also requested that he
 
 *542
 
 let Marto know that Defendant and she were no longer in a relationship.
 

 That evening, Defendant, who worked in the kitchen of a local Holiday Inn, took a knife from work and drove to Crystal's apartment. Upon Defendant's arrival at the apartment, Crystal asked him to call or text Marto from Defendant's cellphone for the purpose of informing Marto that her relationship with Defendant had ended. Crystal told Defendant she would have sexual intercourse with him if he agreed to do so. Defendant and Crystal proceeded to engage in sexual intercourse. Afterward, Crystal asked for his cellphone. Defendant refused her request at which point Crystal began taunting him in "Spanglish."
 

 Defendant then left the apartment to take certain items belonging to him to his car. Upon returning to the apartment, he proceeded to stab Crystal repeatedly with the knife that he had taken from his workplace. Crystal died as a result of her stab wounds.
 

 Defendant fled from the apartment in his car and called Crystal's parents on his cellphone, telling them to go to Crystal's apartment. Crystal's mother did so and discovered her body.
 

 In the early morning hours of 4 May 2011, Defendant was pulled over on I-40 in Tennessee by Officer Johnnie Carter ("Officer Carter") after he observed Defendant driving 45 miles per hour in a 70 mile per hour zone. As Officer Carter approached Defendant's vehicle, he saw through the driver's side window Defendant stab himself several times in the
 
 *102
 
 "neck, upper left chest ... [and] on his side" with a knife. Officer Carter broke the window, and his partner incapacitated Defendant by means of a Taser. Defendant was placed under arrest and taken to Regional Medical Center in Memphis, Tennessee.
 

 On 6 May 2011, Defendant was interviewed at the hospital by Investigator Tim Helldorfer ("Investigator Helldorfer") with the Shelby County District Attorney General's Office in Memphis, Tennessee. On 10 May 2011, Investigator Helldorfer performed an additional interview with Defendant. During the course of the recorded interviews, Defendant confessed to stabbing Crystal and provided details concerning the events leading up to her death.
 

 On 6 June 2011, Defendant was indicted for murder. On 15 October 2012, Defendant was also indicted on a charge of first-degree rape. A jury trial was held in Durham County Superior Court before the Honorable Michael J. O'Foghludha beginning on 18 August 2014. During the State's case, the recordings of Defendant's two interviews with Investigator Helldorfer were admitted into evidence and played for the jury.
 

 At the charge conference, the trial judge informed the parties that he would be instructing the jury on theories of first-degree murder and second-degree murder as well as on charges of first-degree rape and assault on a female. Defendant's trial counsel requested that the jury also be instructed on the lesser included offense of voluntary manslaughter. After listening to the arguments of counsel and taking the request under advisement, the trial court ultimately denied Defendant's request.
 

 The jury found Defendant guilty of second-degree murder and assault on a female. The trial court arrested judgment on the conviction for assault on a female and sentenced Defendant to 156-197 months imprisonment. Defendant gave oral notice of appeal in open court.
 

 Analysis
 

 Defendant's sole argument on appeal is that the trial court committed reversible error by refusing to instruct the jury on voluntary manslaughter. Specifically, he contends that such an instruction was warranted because the evidence at trial supported a finding that he acted in the heat of passion based upon adequate provocation. We disagree.
 

 "Our Court reviews a trial court's decisions regarding jury instructions
 
 de novo.
 
 "
 
 State v. Jenkins,
 

 202 N.C.App. 291
 
 , 296,
 
 688 S.E.2d 101
 
 , 105,
 
 disc. review denied,
 

 364 N.C. 245
 
 ,
 
 698 S.E.2d 665
 
 (2010). It is well settled that
 

 *103
 
 [a] defendant is entitled to have a lesser-included offense submitted to the jury only when there is evidence to support it. The test in every case involving the propriety of an instruction on a lesser grade of an
 
 *543
 
 offense is not whether the jury could convict defendant of the lesser crime, but whether the State's evidence is positive as to each element of the crime charged and whether there is any conflicting evidence relating to any of these elements.
 

 State v. Bedford,
 

 208 N.C.App. 414
 
 , 417,
 
 702 S.E.2d 522
 
 , 526 (2010) (internal citations, quotation marks, and brackets omitted).
 

 "Second-degree murder is the unlawful killing of a human being with malice, but without premeditation and deliberation. Malice may be express or implied and it need not amount to hatred or ill will, but may be found if there is an intentional taking of the life of another without just cause, excuse or justification."
 
 State v. Robbins,
 

 309 N.C. 771
 
 , 775,
 
 309 S.E.2d 188
 
 , 190 (1983) (internal citations omitted). Furthermore, "[i]f the State satisfies the jury beyond a reasonable doubt or if it is admitted that a defendant intentionally assaulted another with a deadly weapon, thereby proximately causing his death, two presumptions arise: (1) that the killing was unlawful and (2) that it was done with malice. Nothing else appearing, the person who perpetrated such assault would be guilty of murder in the second degree."
 

 Id.
 

 (citation omitted).
 

 It is well established that "[v]oluntary manslaughter is distinguished from first and second-degree murder by the absence of malice. Malice is presumed from the use of a deadly weapon. Evidence of adequate provocation has to be present in order to rebut the presumption of malice."
 
 State v. McMillan,
 

 214 N.C.App. 320
 
 , 327-28,
 
 718 S.E.2d 640
 
 , 646 (2011) (internal citations omitted). "One who kills a human being under the influence of sudden passion, produced by adequate provocation, sufficient to negate malice, is guilty of manslaughter."
 
 State v. Woodard,
 

 324 N.C. 227
 
 , 232,
 
 376 S.E.2d 753
 
 , 755-56 (1989) (internal citations and quotation marks omitted). Our Supreme Court has explained that
 

 the heat of passion suddenly aroused by provocation must be of such nature as the law would deem adequate to temporarily dethrone reason and displace malice. Mere words however abusive are not sufficient provocation to reduce second-degree murder to manslaughter. Legal provocation must be under circumstances amounting to an assault or threatened assault.
 

 *104
 

 State v. Montague,
 

 298 N.C. 752
 
 , 757,
 
 259 S.E.2d 899
 
 , 903 (1979) (internal citations omitted).
 

 In the present case, Defendant does not contend that a conflict exists in the evidence as to the circumstances of Crystal's death. Rather, he contends that the undisputed facts give rise to an inference that he killed her in the heat of passion based upon sufficient provocation so as to entitle him to an instruction on voluntary manslaughter.
 

 In addressing Defendant's argument, we find our Supreme Court's decision in
 
 Woodard
 
 instructive. In
 
 Woodard,
 
 the defendant was romantically involved with the victim during the year preceding her death. The victim also dated other men during this time frame. The defendant was jealous of these other men and made occasional threats towards them and the victim.
 
 Woodard,
 

 324 N.C. at 228
 
 ,
 
 376 S.E.2d at 754
 
 .
 

 One night, the defendant, suspecting that the victim was with another man at a nearby hotel, went to the hotel. Upon seeing her car there, he waited for her to leave and then followed her home.
 
 Id.
 
 at 229,
 
 376 S.E.2d at 754
 
 . The defendant then confronted her in her front yard. She told him that she did not want to see him again, instructing him not to call her and to leave her alone.
 

 Id.
 

 The defendant led her to a flower bed a few feet away and began to hug and kiss her. She pulled away from him and began walking toward the front door of her house. The defendant pulled out a gun and fatally shot her in the back of the head.
 

 Id.
 

 The defendant was convicted of first-degree murder. On appeal, he argued that the trial court had erred by refusing to instruct the jury on the lesser included offense of voluntary manslaughter based on his contention that he "killed the victim in the heat of passion caused by provocation adequate to negate the element of malice."
 
 Id.
 
 at 231-32,
 
 376 S.E.2d at 755
 
 . Our Supreme Court rejected this argument, holding as follows:
 

 Assuming
 
 arguendo
 
 that there was some evidence from which a jury could find that
 
 *544
 
 defendant acted under a sudden heat of passion when he shot the victim, merely acting under the heat of passion is not enough to negate malice so as to reduce murder to manslaughter. Such sudden heat of passion must arise upon what the law recognizes as adequate provocation. In the instant case, the fact that the victim, who was not defendant's spouse, was dating other men is not adequate provocation to reduce this homicide from murder to manslaughter. Since there was no evidence from which the jury could properly find that
 
 *105
 
 defendant killed the victim while under the influence of sudden passion,
 
 produced by adequate provocation,
 
 sufficient to negate malice, the trial judge did not err in refusing to instruct the jury that it could find the defendant guilty of voluntary manslaughter.
 

 Id.
 
 at 232,
 
 376 S.E.2d at 756
 
 (internal citation omitted).
 

 In the present case, Defendant maintains that he acted in the heat of passion as a result of Crystal's insistence-shortly after they had engaged in sexual intercourse-that he allow his cellphone to be used to text another man that she and Defendant were no longer in a relationship. He further contends that when he refused this request, Crystal's subsequent taunting of him in "Spanglish" humiliated him. However, we are unable to conclude that either her words, her conduct, or a combination of the two served as legally adequate provocation to negate the presumption of malice so as to require an instruction on voluntary manslaughter.
 

 Our Supreme Court has expressly held that "[m]ere words,
 
 however abusive or insulting
 
 are not sufficient provocation to negate malice and reduce the homicide to manslaughter. Rather, this level of provocation must ordinarily amount to an assault or threatened assault by the victim against the perpetrator."
 
 State v. Watson,
 

 338 N.C. 168
 
 , 176-77,
 
 449 S.E.2d 694
 
 , 700 (1994) (internal citations omitted and emphasis added),
 
 cert. denied,
 

 514 U.S. 1071
 
 ,
 
 115 S.Ct. 1708
 
 ,
 
 131 L.Ed.2d 569
 
 ,
 
 overruled on other grounds by
 

 State v. Richardson,
 

 341 N.C. 585
 
 , 592,
 
 461 S.E.2d 724
 
 , 729 (1995).
 

 Here, Defendant contends that Crystal's words-namely, her request that he help her explain to Marto that their relationship had ended and her verbal taunts-humiliated him. Based on
 
 Woodard
 
 and
 
 Watson,
 
 however, her statements did not constitute legally sufficient provocation to negate the presumption of malice.
 

 Defendant's argument on this issue is also undercut by the evidence that Crystal had made a similar request regarding Marto earlier that day. Therefore, however upsetting it may have been for Defendant to hear it repeated just after he and Crystal had engaged in sexual intercourse, the fact remains that this was not the first time she had made the request to him.
 

 Nor are we persuaded that adequate provocation existed as a result of Crystal's actions in allowing Defendant to have sexual intercourse with her in order to manipulate him into helping facilitate her relationship with Marto. While Defendant characterizes her conduct as a blatantly manipulative attempt to use Defendant's strong feelings for her in
 
 *106
 
 order to further her own purposes at his expense, such conduct simply does not rise to the level of adequate provocation so as to require an instruction on voluntary manslaughter under the principles enunciated by our Supreme Court.
 

 It is also important to note that there was a lapse in time between (1) their act of sexual intercourse, Crystal's request for Defendant's cellphone, and her taunting of him; and (2) Defendant's stabbing of her. Following her request for his cellphone after they had engaged in sexual intercourse, Defendant carried his personal belongings downstairs and placed them in his vehicle. Only then did he return to the apartment and kill Crystal. Thus, Defendant clearly had an opportunity to regain his composure during the interim.
 
 See
 

 State v. Bare,
 

 77 N.C.App. 516
 
 , 522-23,
 
 335 S.E.2d 748
 
 , 752 (1985) ("In order to succeed on this theory, there must be evidence that (1) defendant [acted] in the heat of passion; (2) defendant's passion was sufficiently provoked; and (3)
 
 defendant did not have sufficient time for his passion to cool off.
 
 " (emphasis added)),
 
 disc. review denied,
 

 315 N.C. 392
 
 ,
 
 338 S.E.2d 881
 
 (1986).
 

 *545
 
 Finally, the record reveals that Defendant stabbed Crystal 29 separate times. As our Supreme Court observed in
 
 Watson,
 
 "when numerous wounds are inflicted, the defendant has the opportunity to premeditate from one shot to the next. Even where the gun is capable of being fired rapidly, some amount of time, however brief, for thought and deliberation must elapse between each pull of the trigger."
 
 Watson,
 

 338 N.C. at 179
 
 ,
 
 449 S.E.2d at 701
 
 (internal citations and quotation marks omitted). The same logic applies to the infliction of multiple stab wounds.
 
 [2]
 

 Therefore, we conclude that the trial court did not err in refusing to instruct the jury on the theory of voluntary manslaughter. Accordingly, Defendant's argument is overruled.
 

 Conclusion
 

 For the reasons stated above, Defendant received a fair trial free from error.
 

 NO ERROR.
 

 Judges STEPHENS and STROUD concur.
 

 [1]
 

 Throughout the trial transcript, "Marto" is at times referred to as "Matto," "Marta," and "Marlo." However, all of these spellings refer to the same individual.
 

 [2]
 

 The fact that Defendant took a knife from his workplace and brought it to Crystal's apartment further belies the notion that the element of malice was rebutted.